## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JILL THOMPSON,**

      **Plaintiff,**

      **v.**

**CONDOLEEZA RICE, Secretary of State,**

      **Defendant.**

**Civil Action No.  03-2022 (JDB)**

### MEMORANDUM OPINION

Plaintiff Jill Thompson, a Department of State employee serving in the Foreign Service, brings this action against the Secretary of State alleging discrimination on the basis of disability in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et. seq.*  Plaintiff asserts that defendant failed to provide a reasonable accommodation for her disability, and also that defendant did not select her for two overseas job positions because of her disability.  Defendant has moved for summary judgment on both claims.  For the reasons explained below, the Court grants defendant's motion for summary judgment.

### BACKGROUND[1]

Plaintiff Jill Thompson is a Certified Public Accountant (CPA) with a master's degree in accounting who has been employed by the State Department since 1990.  After serving overseas at Foreign Service postings in Bangladesh, the Dominican Republic, Russia, and Thailand, in October 2000 plaintiff began a two-year tour of duty in Washington, D.C., in the Office of

---

[1] The facts summarized in this section are not in dispute, except where noted.  For ease of reference, the Court will refer to the exhibits attached to defendant's motion for summary judgment and plaintiff's opposition to summary judgment as "Def. Ex." and "Pl. Ex.," respectively, and to the exhibits attached to defendant's reply brief as "Def. Suppl. Ex."

International Financial Services ("IFS") in the State Department's Bureau of Financial

Management Policy ("FMP").  On September 25, 2001, plaintiff was hospitalized and diagnosed

with a Grade 1 subarachnoid brain hemorrhage (hereinafter "hemorrhage" or "SAH").[2]  In a

memo to "Plaintiff's employer" dated October 22, 2001, plaintiff's neurologist indicated that

plaintiff could resume normal work duties; however, he advised that she avoid a "hostile work

environment" and undue stress.  In a subsequent memo dated November 16, 2001, also signed by

plaintiff's doctor, defendant was informed that plaintiff "must be allowed to manage levels of

stress and hypertension associated with the workplace."[3]

Upon plaintiff's return to work in early November, she was placed on a "detail" that was

originally intended to last for two weeks, but instead extended until sometime in May 2002.

During the time she was on detail, plaintiff was located in the Human Resources office.  Plaintiff

complained to defendant about a lack of structure and supervision in her position and job

assignments while on this detail.

On January 16, 2002, plaintiff filed a grievance with the State Department alleging

abusive treatment by co-workers in IFS dating back to early 2001.  The grievance focused on her

co-workers' allegations of an improper relationship between plaintiff and her supervisor and on

---

[2] According to plaintiff's neurologist, such hemorrhages are classified according to severity on the Hunt and Hess grading scale from Grade 1 (least severe) to Grade 5 (most severe).  Def. Ex. 4 (Oraee Depo.) at 28-29.

[3] Although the memo is signed by the doctor, he testified at his deposition that plaintiff drafted the memo and he signed it.  Def. Ex. 4 (Oraee Depo.) at 64-65. He also testified that plaintiff may have drafted the October 22 memo as well.  Id. at 61-62.

the subsequent administrative investigation.[4]  Around this same time in "early 2002," plaintiff

began suffering from persistent fatigue and anxiety.  Dr. Oraee prescribed Provigil for the fatigue

and Zoloft for the anxiety disorder starting in February 2002.

On February 22, 2002, plaintiff contacted Barbara Pope of the State Department's Office

of Civil Rights, asking for assistance in resolving her work assignment issues.  Plaintiff agreed to

provide documentation to the Office of Medical Services ("OMS"), including her medical

records.  However, on March 15, 2002, Ms. Pope informed plaintiff in writing that the grievance

she had filed in January precluded the Office of Civil Rights from assisting her further.  On

March 21, 2002, plaintiff submitted a medical questionnaire requesting "support" in carrying out

her doctor's instructions in the upcoming bidding cycle for foreign service assignments.

Plaintiff remained on the detail assignment, without a position description, work

requirements, or a designated rating official, until May 2002, when she applied for and received

a temporary six-week assignment in Berlin.  During her time in Berlin, plaintiff was

accompanied by either her husband or her parents.  Plaintiff worked full 40-hour weeks while in

Berlin.  After her return, plaintiff worked as a recruiter in Human Resources.

In preparation for the fall 2002 bidding cycle, plaintiff discussed her medical condition

with the Office of Medical Services and received verbal approval for several overseas postings.

Subsequently, plaintiff sought overseas Foreign Service positions in Frankfurt, Germany and

Paris, France, two of the locations for which she had received verbal clearance.  In November

---

[4] The allegations and investigation referred to here were the subject of two other lawsuits in this Court:  Thompson v. Dep't of State, 400 F. Supp. 2d 1 (D.D.C. 2005), and Thompson v. Pope, 397 F. Supp. 2d 28 (D.D.C. 2005).

2002, plaintiff's medical clearance was upgraded to Class 2 (limited clearance for overseas posts).

Plaintiff was not selected for either the Frankfurt or Paris positions.  In response to her inquiries, plaintiff was told that the Frankfurt position required a Class 1 medical clearance because it was a "rover" position that involved significant travel, including travel to some remote posts in Europe.  Plaintiff was also told that another qualified person was chosen for the Paris position..  On March 7, 2003, plaintiff filed a formal complaint of disability discrimination with the State Department's Office of Civil Rights.  Her complaint was denied on July 2, 2003 on the ground that plaintiff had already pursued substantially similar issues under negotiated grievance procedures.  Plaintiff's grievance appeal to the Foreign Service Grievance Board was denied in October 2003.  She was assigned to a post in Managua, Nicaragua in 2004, where she currently serves.

Plaintiff's fatigue has persisted during this course of events, although her anxiety has been controlled by medication.  In May 2004, plaintiff began taking Wellbutrin in addition to Provigil for additional help in combating her fatigue.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## DISCUSSION

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability."  29 U.S.C. § 794(a).  Section 501 of the Act further mandates that employers take affirmative steps to provide for qualified persons with disabilities.  29 U.S.C. § 791(b); see Carr v. Reno, 23 F.3d 525, 528 (D.C. Cir. 1994).  EEOC regulations interpreting Section 501 require agencies to make reasonable accommodations for persons with disabilities unless such accommodations would impose undue hardship on the agency.[5]  29 C.F.R. § 1630.9(a).

---

[5] The regulations interpreting the Americans with Disabilities Act (ADA), 29 C.F.R. pt. 1630, also apply to Section 501 of the Rehabilitation Act.  See 29 C.F.R. § 1614.203(b).

To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (quoting Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). To establish a prima facie case of prohibited employment discrimination under the Act based on disparate treatment, a plaintiff must show, by a preponderance of the evidence, that she "'[has] a disability within the meaning of the [Act]; that [she] was 'qualified' for the position with or without reasonable accommodation; and that [she] suffered an adverse employment action because of [her] disability.'" Duncan v. Washington Metro. Area Transit Auth., 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc) (quoting Swanks v. Washington Metro. Area Transit Auth., 179 F.3d 929, 934 (D.C. Cir. 1999)).  Defendant initially moves for summary judgment on the ground that plaintiff is not a qualified person with a disability within the meaning of the Rehabilitation Act.  Because plaintiff's status as a disabled person is an essential element of both of plaintiff's claims, the Court will address this issue first.

## I.    Plaintiff's Disability Status

A person is disabled under the Rehabilitation Act if she "has a physical or mental impairment which substantially limits one or more of [her] major life activities; has a record of such an impairment; or is regarded as having such an impairment."[6]  29 U.S.C. § 705(20)(B).

---

[6] The liability standards of the Rehabilitation Act and the ADA are the same in employment discrimination cases, and thus cases interpreting either statute are applicable in defining the term "disability" and otherwise determining liability. See 29 U.S.C. § 794(d) ("The
(continued...)

Defendant argues that plaintiff's impairment is not a disability because the effects of the hemorrhage were only temporary. Alternatively, defendant argues that plaintiff's impairment is not a disability because it does not substantially limit one or more of her major life activities. Plaintiff responds that, as a result of the hemorrhage, she suffers from acute fatigue that has persisted and grown worse over a period of more than three years, and that her condition has substantially limited her in several major life activities.

### A.        Physical or Mental Impairment

The first prong of the analysis is to determine whether plaintiff suffers from a physical or mental impairment. Although plaintiff's characterization of the impairment at issue has shifted over the course of this litigation, it is now clear after discovery and briefing that plaintiff alleges that her impairment consists of the brain hemorrhage and the fatigue she attributes to that event. Initially, plaintiff characterized her impairment as the result of "continuing effects of a life-threatening subarachnoid brain hemorrhage" she suffered on September 25, 2001. Am. Compl. at ¶ 12. During discovery, plaintiff stated that she began at some point to suffer from "chronic fatigue," which "grew progressively worse during 2002 and 2003." Def. Ex. 8 (Pl.'s Resp. to Def.'s Interrogs., Resp. No. 6) at 5. Plaintiff also claims that she began to experience panic attacks "with growing frequency in 2002" and subsequently developed trichotillomania, an obsessive-compulsive hair-pulling disorder. See Pl. Ex. 1 (Decl. of Jill Thompson) at ¶ 3. When

---

[6](...continued)
standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the [ADA]."); see also Breen v. Dep't of Transp., 282 F.3d 839, 841 (D.C. Cir. 2002) (applying ADA liability standards in reviewing Rehabilitation Act claim pursuant to § 794(d)); Branham v. Snow, 392 F.3d 896, 902 (7th Cir. 2004) (pursuant to 29 U.S.C. § 794(d), "we refer to the provisions and standards of the ADA in determining whether there has been a violation of the Rehabilitation Act in this [employment] context").

asked by the Court at the motions hearing to clarify the impairment plaintiff is claiming, her

attorney responded that the "brain hemorrhage ... and [its] continuing neurological effects"

constitute plaintiff's physical impairment, Summ. J. Hr'g Tr. (unofficial) at 23, lines 17-18, and

that "the main effect was really excessive fatigue and the problems of obtaining restful sleep,"

id. at 24, lines 15-16.  Thus, the Court focuses its analysis on the hemorrhage and the fatigue.[7]

The EEOC regulations define a physical or mental impairment as "[a]ny physiological

disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the

following body systems: neurological, musculoskeletal, special sense organs, respiratory

(including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and

lymphatic, skin, and endocrine; or ... [a]ny mental or psychological disorder, such as mental

retardation, organic brain syndrome, emotional or mental illness, and specific learning

disabilities."[8]  29 C.F.R.  § 1630.2(h).  Plaintiff's hemorrhage clearly falls within the definition

of impairment under the Rehabilitation Act.  However, as defendant points out, the hemorrhage

was an injury of temporary duration which required only a two-day hospital stay and

approximately six weeks of sick leave.  See Pl. Ex. 15 (Medical Questionnaire) at 2; Def Ex. 5

---

[7] Plaintiff's anxiety and obsessive-compulsive disorder warrant no further consideration because plaintiff concedes that these conditions were "sufficiently mitigated and controlled through medication," Pl. Opp'n. Mem. at 9.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999) (holding that an impairment corrected by medication or other measures does not substantially limit a major life activity and thus cannot constitute a disability).

[8] The Supreme Court has noted that "no agency has been given authority to issue regulations interpreting the term 'disability' in the ADA," but that the EEOC has nonetheless issued such regulations.  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 194 (2002).  The Court assumed without deciding that the regulations were reasonable, but refrained from deciding whether any deference would be due.  Id.; see also Bragdon v. Abbott, 524 U.S. 624, 642 (1998) (noting the responsibility for implementing the Act is not delegated to a single federal agency and leaving the question of deference unanswered).  The parties do not dispute the validity of the regulations, and thus the Court assumes without deciding that the regulations should be applied here.

(Thompson Depo.) at 34.  Plaintiff has not suffered another hemorrhage since September 2001. Thus, defendant contends that plaintiff did not suffer from an impairment when she returned to work, requested reasonable accommodations or applied for the positions at issue.[9]  Plaintiff responds that the impairment at issue is, collectively, the hemorrhage and the fatigue she attributes to that event.[10]

Plaintiff asks the Court to infer that her excessive fatigue is a consequence of the hemorrhage because she was not fatigued before the hemorrhage.  However, plaintiff has not provided any medical evidence that fatigue is a lingering effect of a Grade 1 subarachnoid hemorrhage.  Indeed, the testimony of plaintiff's own neurologist suggests that fatigue is not typically a side effect.  See Def. Ex. 4 (Oraee Depo.) at 54.  The doctor testified that other than headaches, which could persist for weeks or months, there should not be any long-term neurological effects following a Grade 1 hemorrhage.  Id.  Plaintiff's medical records do not suggest that fatigue resulted from the hemorrhage in her particular case.  In the months following the hemorrhage, plaintiff's neurologist observed that her symptoms were limited to headaches with no mention of fatigue.  See Def. Ex. 9 (Dr. Oraee letter to Dr. Al-Bassam dated 10/11/2001); Def. Ex. 10 and 11 (Dr. Oraee office notes dated 10/22/2001 and 11/16/2001). Later, when plaintiff began suffering from fatigue, her neurologist prescribed Provigil and continued to see her as a patient for medication monitoring; however, this medication was not a

_____

[9] The relevant time periods are October/November 2001 (return to work and first request for accommodation), March 2002 (second request for accommodation), and mid-September through mid-November 2002 (2002 bidding cycle).

[10] Plaintiff recognizes the need to tie the two conditions together because there is a significant question as to whether fatigue in and of itself constitutes an "impairment" under the Act, as discussed in more detail below.  Plaintiff's ability to establish such a connection is also important because much of the evidence indicates that the persons involved in the non-selection decisions she challenges had knowledge only of her hemorrhage.

treatment for the hemorrhage.  Def. Ex. 4 (Oraee Depo.) at 68-69.  Moreover, plaintiff herself

describes the stressful situation at work as one cause of her fatigue, and plaintiff's neurologist

also suggests that her fatigue may be due to work-related stress rather than the hemorrhage.  See

Def. Ex. 8 (Pl. Resp. to Def. Interrogs., Resp. No. 6) at 4-5; Def. Ex. 4 (Oraee Depo.) at 63-64.

Fatigue is a common complaint and may be a symptom of a number of conditions.  The onset of

the fatigue a few months after the hemorrhage, standing alone, is at best minimal evidence

insufficient to create a genuine dispute of material fact as to causation.  The Court finds that no

reasonable trier of fact could conclude from the evidence of record that the fatigue was caused

by the hemorrhage. Therefore, the Court considers the hemorrhage and the fatigue as two

separate impairments.

It is undisputed that plaintiff's hemorrhage required only a two-day hospital stay and six

weeks of sick leave.  Plaintiff's neurologist classified her hemorrhage as Grade 1, the least

severe classification, and testified that her prognosis was excellent with little chance of

recurrence.  Def. Ex. 4 (Oraee Depo.) at 29, 53.  The neurologist also testified that plaintiff's

headaches might last for several months, but after that he did not expect any long-term effects.

Id. at 54.  As of October 22, 2001, plaintiff's headaches were decreasing in frequency and

intensity, id. at 60, and her neurologist approved plaintiff's return to full-time work with no

restrictions other than to avoid undue stress.  See Def. Ex. 2 (Oraee Memo dated 10/22/2001).

Plaintiff did return to work in early November at full-time or nearly full-time hours.  See Def.

Ex. 5 (Thompson Depo.) at 34.  Based on these undisputed facts, the Court holds that the

hemorrhage was not an impairment by the time plaintiff returned to work and the challenged

employment actions subsequently took place.

The Court next considers whether fatigue, standing alone, is an impairment under the Rehabilitation Act.  The case law offers little guidance on this issue, although at least one court has assumed without deciding that fatigue may qualify as an impairment only if it is shown to be caused by an underlying medical condition.  See Riel v. Elec. Data Sys. Corp., 99 F.3d 678, 682 (5th Cir. 1996).  This approach reflects the regulatory requirement that an "impairment" be defined by reference to a "physiological condition" affecting one or more body systems, or a "mental or psychological disorder," but presumes that fatigue is by itself not such a physical condition – a matter not altogether clear.   It also reflects the common sense recognition that fatigue is a common, often transient, and subjectively perceived condition that is not readily objectively verifiable.[11]

Some cases addressing conditions that are marked by similar difficulties of assessment indicate that medical diagnosis is required to find that an impairment exists.  See, e.g., Snead v. Metro. Prop. & Cas. Life Ins. Co., 237 F.3d 1080, 1088 (9th Cir. 2001) (stress and depression may or may not be considered impairments depending on whether they result from a documented physiological or mental disorder); Duda v. Bd. of Educ. of Franklin Park Pub. School Dist., 133 F.3d 1054, 1059 (7th Cir. 1998) (distinguishing claims of personal conflict, temperament, and irritability, which do not meet the definition of a disability, from medically diagnosed mental conditions, which do).  Other cases suggest that such testimony is not always necessary.  See Marinelli v. City of Erie, Pa., 216 F.3d 354, 360 (3d. Cir. 2000) (stating that the need for medical testimony depends on the jury's ability to comprehend the alleged impairment); Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996) (stating that there is no general rule requiring medical

---

[11] One might feel fatigue from certain lifestyle choices, such as eating a poor diet, choosing to sleep less in order to pursue other activities, or personal or work-related stress.

testimony to establish a disability and in some cases a plaintiff's description of treatment and

symptoms over a long period would suffice).  Although these cases do not directly address the

significant difficulties with recognizing fatigue standing alone as an impairment, the reasoning

suggests that where fatigue is adequately documented by medical records, it may constitute an

impairment under the Act because such documentation could satisfy the regulatory requirement

of a "physiological condition" affecting one or more body systems.

Here, plaintiff has not presented any evidence that she has been diagnosed with "chronic

fatigue syndrome" or another condition or disorder which causes fatigue.  However, there is

evidence in the record that plaintiff complained of fatigue to her neurologist, and that, in

response, he prescribed Provigil, a stimulant used to treat fatigue.  Pl. Ex. 12 (Oraee office note

dated 7/11/2002); Def. Ex. 4 (Oraee Depo.) at 67.  Although the quantum of evidence is small,

viewing the facts in the light most favorable to the plaintiff, a reasonable trier of fact could infer

from the prescriptions and other testimony regarding plaintiff's condition that her chronic and

severe fatigue is a physiological disorder affecting her neurological system.  Therefore, the Court

will assume without deciding that, under the circumstances of this case, plaintiff's fatigue can be

considered an impairment under the Rehabilitation Act.

**B.     Substantial Limitation of Major Life Activities**

The primary remaining dispute therefore hinges on whether, during the relevant time

periods, plaintiff's fatigue substantially limited one or more major life activities.  As the

Supreme Court has emphasized, "merely having an impairment does not make [an individual]

disabled."  Toyota, 534 U.S. at 195.  A claimant must demonstrate that the impairment

"substantially limits" a "major life activity."  Id.  Furthermore, the Supreme Court has cautioned

that these terms "need to be interpreted strictly to create a demanding standard for qualifying as

disabled," in order to be consistent with legislative findings regarding the number of disabled Americans and the purposes that motivated enactment of the ADA.  Id. at 197.

Neither the ADA nor the Rehabilitation Act defines "major life activity."  However, the Supreme Court has interpreted "major life activities" to mean "those activities that are of central importance to daily life,"  Toyota, 534 U.S. at 197; see also Bragdon, 524 U.S. at 638 (considering an activity's "comparative importance" in life and its general "significance").   In deciding whether something is a major life activity, courts consider the activity's significance as contemplated by the statute, rather than its importance to a particular individual.  See Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999); Colwell v. Suffolk Cty. Police Dep't, 158 F.3d 635, 642 (2d Cir. 1998).

The EEOC Regulations define "substantially limits" as "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1).  According to the Supreme Court, "substantially in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'"  Toyota, 534 U.S. at 196.  Factors that should be considered in determining whether an individual is substantially limited in a major life activity include "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2); see Toyota, 534 U.S. at 195.

Because Congress intended the existence of a disability to be determined by defining disability "with respect to an individual," the determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis.  Toyota, 534 U.S. at 198.  Merely submitting a medical diagnosis of an impairment is insufficient to establish disability status.  Id.  Instead, a plaintiff must "[offer] evidence that the extent of the limitation [caused by the impairment] in terms of their own experience ... is substantial.'"  Id. (citations omitted).  The *impairment* must "prevent or severely restrict" the individual in the major life activity at issue and must have a permanent or long-term impact.  Id.[12]  Moreover, the corrective or mitigating effects of medication and other devices "must be taken into account in judging whether an individual possesses a disability."  Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999); see also Sutton, 527 U.S. at 482-83.

Defendant argues that plaintiff's impairment -- whether it is characterized as the hemorrhage plus associated fatigue or as fatigue alone -- did not substantially limit her in one or more major life activities.  Plaintiff claims that she was, and is, substantially limited in the major life activities of working in the foreign service, sleeping, and caring for herself.  The Court will address each of these contentions in turn.

### 1.    Working

Plaintiff claims that she is substantially limited in "what for her was a major life activity: working in the Foreign Service."  Pl. Opp'n Mem. at 17.   She contends that she is substantially

---

[12] However, "while the presumption exists that temporary impairments do not qualify as disabilities . . . , temporary conditions still require a case-by-case evaluation."  Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 468 (4th Cir. 2002) (citing Toyota, 534 U.S. at 198; Sutton, 527 U.S. at 483).

limited in working in the Foreign Service because her medical clearance restricts her to certain overseas posts.

Both the Supreme Court and the D.C. Circuit have assumed without deciding that working is a major life activity.  See Sutton, 527 U.S. at 492; Duncan, 240 F.3d at 1114 n.1.[13] Although there are serious difficulties with recognizing working as a major life activity,[14] the Court will assume without deciding that it is one, because defendant does not contest the issue.

To establish that an impairment substantially limits the ability to work, a plaintiff must "allege and prove that in his particular circumstances ... his impairment prevents him from performing a 'substantial class' or 'broad range' of jobs otherwise available to him." Duncan, 240 F.3d at 1115.  To be substantially limited in working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." Sutton, 527 U.S. at 492.  In making its determination, a court may consider factors such as "the geographical area to which the individual has reasonable access and 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.'" Duncan, 240 F.3d at 1114 (internal citations omitted).  The plaintiff must

_____

[13] The Second and Fifth Circuits have recognized working as a major life activity.  See Bartlett v. N.Y. State Bd. of Law Exam'rs, 226 F.3d 69, 80 (2d Cir. 2000); EEOC v. R.J. Gallagher Co., 181 F.3d 645, 654-55 (5th Cir. 1999).  Working is listed in the EEOC regulations as an activity that may be considered a major life activity.  29 C.F.R. § 1630.2(i).

[14] In a concurrence to the en banc decision in Duncan, Judge Randolph, joined by Judges Williams and Sentelle, discussed the difficulties inherent in recognizing working as a major life activity.  See 240 F.3d at 1117-18.  Judge Randolph noted that in Sutton the Supreme Court referred to EEOC recommendations that "working be viewed as a residual life activity, considered as a last resort, only '[i]f an individual is not substantially limited with respect to any other major life activity.'" Duncan, 240 F.3d at 1117 (quoting Sutton, 527 U.S. at 492) (internal citations omitted).  He also pointed out that if working is a major life activity, the existence of a disability could turn on factors unrelated to an individual's impairment, such as the variation in job availability with swings in the economy.  Id. at 1118.

"produce some evidence of the number and types of jobs in the local employment market in order to show that he is disqualified from a substantial class or broad range of such jobs." Id. at 1115-16.

Plaintiff's claim cannot succeed because she has not shown that she is excluded from a substantial class or broad range of jobs. Her characterization of the broad range of jobs as "working in the Foreign Service" is inconsistent with the standards articulated in Sutton and Duncan. As discussed above, one of the key factors in defining the substantial class or broad range of jobs is the employee's "training, knowledge, skills, or abilities," which are in this case, at a minimum, plaintiff's training and knowledge in the areas of accounting and financial management and her demonstrated ability to perform jobs in the human resources field. Plaintiff makes no attempt to argue that she has been excluded from the broad range or class of jobs in accounting, financial management, or human resources that exist in the geographical areas to which she has access, including, of course, positions outside of the State Department.

Furthermore, the undisputed facts before the Court do not indicate that plaintiff has been substantially limited in working in the State Department, or in its overseas posts commonly referred to as the Foreign Service. To the contrary, the undisputed evidence shows that, since returning to work after her hemorrhage in late 2001, plaintiff has worked in a series of full-time positions in the State Department, including a detail in Human Resources from November 2001 until May 2002, a six-week temporary assignment in Berlin, and a position as a HR recruiter from August 2002 to August 2003. She is still working at the State Department in an overseas post in Nicaragua. Indeed, plaintiff's neurologist and psychiatrist have both approved of her working a 40-hour week. See Pl. Ex. 15 (Medical Questionnaire) at 3; Pl. Ex. 10 (letter from Dr. Campbell); Def. Ex. 4 (Oraee Depo.) at 71.

-16-

Plaintiff also has not been limited in her ability to travel for work.  Beginning in June 2002, plaintiff worked full days without a problem on a six-week overseas assignment in Berlin. See Def. Ex. 5 (Thompson Depo.) at 57, 59; Def. Suppl. Ex. 3 (Allegrone Decl.) at ¶¶ 3-4. Subsequently, while working as a human resources recruiter, plaintiff participated in job fairs outside the D.C. area which required standing and talking to people for several hours.  See Def. Ex. 5 (Thompson Depo.) at 107-108; Pl. Resp. to Def.'s Statement of Material Facts Not in Dispute at ¶ 12.  Although plaintiff states that she took breaks during the job fairs and worked in a group, there is no indication that her ability to stand and talk for several hours was significantly less than that of an average person.  Pl. Resp. to Def.'s Statement of Material Facts Not in Dispute at ¶ 12.  Plaintiff has simply not shown that her impairment had any negative effect on either the quality or quantity of her work.  In her deposition, she admitted that none of her supervisors in the previous 18 months had complained about the quality of her work.  Def. Ex. 5 (Thompson Depo.) at 26-27.  In addition, plaintiff took on and kept supervisory duties in 2002. Id. at 27.

In the end, it cannot be ignored that, since September 2004, plaintiff has been working in Nicaragua without any indication that she is unable to work a full work week.  Despite her statements that she is exhausted at the end of the work day, that her exhaustion grows worse as the week progresses, and that at the end of the week she is completely spent, plaintiff is nonetheless able to get through a work day without apparent adverse effects on her performance. Hence, the undisputed evidence overwhelmingly establishes that plaintiff is not substantially limited in the major life activity of working, or working in the Foreign Service.

2.      **Sleeping**

Plaintiff next claims that her impairment imposes a substantial limitation on the major

life activity of sleeping.  Although this Circuit has not decided the issue, see Haynes v. Williams,

392 F.3d 478, 482 (D.C. Cir. 2004); Scarborough, 190 F.Supp. 2d at 21 n.14, several other

circuits have recognized sleeping as a major life activity.  See, e.g., EEOC v. Sara Lee Corp.,

237 F.3d 349, 352-53 (4th Cir. 2001); McAlindin v. Cty. of San Diego, 192 F.3d 1226, 1234 (9th

Cir. 1999); Pack, 166 F.3d at 1305; Colwell, 158 F.3d at 643.  The precise nature of plaintiff's

sleep difficulties is hard to discern.  Plaintiff contends that "at the heart of [her] disability is her

inability to sleep normally, engage in restful sleep, or wake up normally." Pl. Opp'n Mem. at 1.

However, she also claims that her primary difficulty is excessive sleepiness and inability to

awaken by herself.

Plaintiff relies on her own testimony and the declarations of her husband and brother to

support this claim. See Pl. Ex. 1 (Decl. of Jill Thompson); Pl. Ex. 4 (Decl. of Lee Thompson); Pl.

Ex. 5 (Decl. of Mark Meznar).  For example, plaintiff's husband states that she has little stamina,

that she never seems rested, that "within hours of getting up in the morning she is ready to go

back to sleep," and that left on her own she sleeps abnormal lengths of time and cannot wake up

naturally.  Pl. Ex. 4 (Decl. of Lee Thompson).  But other than her neurologist's notes stating that

she continues to complain of fatigue and that he continues to prescribe stimulants to help her

combat fatigue, plaintiff has not submitted any evidence of a medical diagnosis or description of

a recognized sleep disorder.

Accepting plaintiff's testimony as true and drawing all reasonable inferences in her favor,

the Court nonetheless finds that there is insufficient evidence to support a finding that plaintiff is

substantially limited in the activity of sleeping.  First, she does not appear to have a substantial

limitation on sleeping; rather, her problem is that she sleeps too much and has difficulty waking

up.  Second, because "difficulty sleeping is extremely widespread," most circuits that have

addressed the issue of substantial impairment in the context of sleeping require evidence that the

plaintiff's sleep disturbances are worse than the quality of sleep of the general population.  See

Sara Lee, 237 F.3d at 352; Pack, 166 F.3d at 1306; Colwell, 158 F.3d at 644.  Other than a

statement from her brother, who sees her at most a few weeks per year, plaintiff has provided no

evidence that her sleep disturbances are any worse than those suffered by many in the general

population.  Finally, because sleep needs vary greatly from individual to individual, it is

appropriate to examine the effects of plaintiff's sleep limitations on her waking activities.  See

Haynes, 392 F.3d at 486 (Williams, J., concurring).  Without exception, plaintiff has been able to

work full-time since November 2001 without any record of excessive tardiness or absence, or

diminution in the quality or quantity of her work, that would support the assertion that excessive

sleepiness has had a substantial impact on her waking activities.  For these reasons, the Court

concludes that plaintiff has not demonstrated a substantial limitation on the activity of sleeping,

and defendant is entitled to summary judgment on plaintiff's claim of disability based on her

assertion of a sleep limitation.

### 3.      Caring for Oneself

Plaintiff asserts that she "lacks the energy to live independently," arguing indirectly that

she is substantially limited in the major life activity of caring for oneself.  Pl. Opp'n Mem. at 11.

Specifically, plaintiff states that she lacks the energy to "undertake basic household tasks, drive

long distances, and get up in the morning." Id. at 11-12.  She further states that she "must rely on

medication and physical assistance to perform routine tasks, care for herself, and remain

employed."  Id. at 12.

The EEOC regulations list caring for oneself as a major life activity.  See 29 C.F.R. § 1630.2(i).  The regulations do not, however, delineate specific activities that fall within the ambit of caring for oneself.  The Ninth Circuit has held that caring for oneself comprises "basic activities such as getting up in the morning, bathing, dressing, and preparing and obtaining food."  Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1134 (9th Cir. 2001) (quoting EEOC Enforcement Guidance: Psychiatric Disabilities and the ADA, FEP (BNA) 405:7461, at 7467 (March 25, 1997)).  The Eighth Circuit has also found that caring for oneself includes such tasks.  See  Fenney v. Dakota, Minn. and E. R.R. Co., 327 F.3d 707, 716 (8th Cir. 2003) (accepting that bathing, shaving, preparing meals, dressing, and using the restroom are tasks associated with caring for oneself).  A person whose impairment "causes him to take inordinately more time than others to complete a major life activity is substantially limited as to that activity under the ADA."  See Humphrey, 239 F.3d. at 1135 (finding that a plaintiff whose obsessive-compulsive disorder caused her to take several hours to wash and brush her hair and sometimes to take 9-10 hours to get ready for work was substantially limited in caring for herself).  At least one court has held that a limitation in one's ability to perform housework, such as mopping, is not a substantial limitation in caring for oneself.  McKay v. Toyota Motor Mfg., U.S.A., 878 F.Supp. 1012, 1015 (E.D. Ky. 1995), *aff'd*, 110 F.3d 369 (6th Cir. 1997).

Here, plaintiff asserts that she is substantially limited in caring for herself and refers to certain tasks, such as basic household tasks, driving long distances, and getting up in the morning.  However, she has provided little evidence to substantiate this claim, or otherwise describe the degree to which she is limited with any reasonable specificity.  In her deposition, plaintiff testified that she does not do much in the house, that it takes all of her energy and concentration to function at work, and that she spends all of her time outside work resting.  Def.

Ex. 5 (Thompson Depo.) at 23.  However, this testimony does not lead to an inference that plaintiff is substantially limited in caring for herself.  Her husband's testimony does little to support her claims either.  His statement that she relies on him for assistance in waking up and for household maintenance simply fails to indicate that she is unable to care for herself, and indeed, it is common knowledge that many people require assistance on a regular basis to wake up (e.g., an alarm clock) and to perform cleaning or similar household tasks.   Plaintiff provides no evidence of tardiness or excessive absence from work which would indicate that she has difficulty getting up in the morning with the help of ordinary means, or that basic tasks such as bathing and dressing take an inordinate amount of time.  Plaintiff's testimony that she would be able to handle the demands of an overseas position requiring extensive travel also indicates that she is not substantially limited in caring for herself.  Finally, plaintiff's statement that since her hemorrhage she has always traveled in the company of others does not save her claim, as she does not present evidence indicating the *extent* to which she requires her companions' assistance in caring for herself.   In short, plaintiff has not produced evidence from which a reasonable trier of fact could conclude that she is substantially limited in caring for herself, or in any other major life activity.  Accordingly, the Court concludes that plaintiff does not have a disability under the Rehabilitation Act, and will grant defendant's motion for summary judgment on this issue.

### C.    Record Of Impairment As Disability

Under the Rehabilitation Act, a person is also disabled if he has a record of an impairment.  See 29 U.S.C. § 705(20)(B).  A record of impairment means that a person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2(k). The record must be one that shows "an impairment that substantially limits one or more major life activities."  Colwell, 158

F.3d at 646.  Furthermore, it must be a "record relied on by an employer [indicating] that the individual has or has had a substantially limiting impairment."  Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1229 (11th Cir. 1999) (internal citations omitted).

Plaintiff asserts that she has a "record of impairment," Pl. Opp'n Mem. at 9, but does not explain how such a record further advances her disability claim.  Because plaintiff must show a record of impairment that *substantially limits one or more major life activities*, the Court concludes that, for the reasons already discussed in Part I.B *supra*, plaintiff cannot succeed in establishing her disability by this route.

### D.    Being "Regarded As" Having A Disability

Plaintiff also argues that, by reducing her medical clearance, defendant "regarded" her as having a disability under the third definition of "individual with a disability," found at 29 U.S.C. § 705(20)(B)(iii).  Pl. Opp'n Mem. at 16.  In the State Department, employees must obtain a medical clearance before they can be assigned to an overseas post.  See Supp. Decl. of Jill Thompson dated 2/09/2006, Ex. 1 (U.S. Dep't. of State Foreign Affairs Manual, 16 FAM 224) at 2.  The three levels of medical clearance issued to employees are Class 1, unlimited clearance for overseas assignment; Class 2, limited clearance for assignment abroad; and Class 5, not cleared for assignment abroad.  Id.  For individuals with a Class 2 clearance, the Office of Medical Services must approve overseas assignments on a post-specific basis. Id.

An individual is "regarded as" disabled if her employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489.  However, "an employer's attempts to accommodate an employee's concerns and perceived needs do not establish that the employer

regarded the employee as having a disability."   Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 13 (D.D.C. 2000) (citation omitted).

Defendant argues that because working abroad is not a major life activity, plaintiff does not qualify as disabled under the "regarded as" definition.  As discussed in Section B.1 *supra*, the Court agrees that working abroad is not a major life activity.  Furthermore, plaintiff's restricted medical clearance does not show that defendant regarded plaintiff as disabled because it reveals nothing about whether defendant believed that plaintiff had an impairment that substantially limited her in a major life activity.  As defendant points out, the medical clearance system is used to determine whether a person may be appropriately posted in a foreign country that has limited medical facilities, recognizing that some medical conditions could be exacerbated by overseas postings or that certain locations may not have adequate facilities to treat an employee's condition.  See Def. Reply Mem. at 24; Def. Ex. 19 (Foreign Affairs Manual, volume 3, § 1931).  That system does not indicate whether a person is substantially limited in a major life activity, and thus cannot be characterized as automatically qualifying persons as being disabled under the "regarded as" provision of the Rehabilitation Act.  See EEOC v. J. B. Hunt Transp., Inc., 321 F.3d 69, 75 (2d Cir. 2003) (holding that employer's policy of screening out applicants taking medications that could impair driving ability did not "regard" applicants as disabled because "driving freight-carrying tractor-trailer trucks over long distances for extended periods of time" did not constitute a broad range or class of jobs).  Indeed, the broad interpretation advocated by plaintiff would mean all State Department employees with limited medical clearances are disabled, a result in conflict with the intent of the Rehabilitation Act.  See Toyota, 534 U.S. at 197-98.  Therefore, the Court finds that defendant has not regarded

plaintiff as disabled by restricting her medical clearance and thereby limiting her ability to serve in some overseas posts.

III.     **Disability Discrimination Claims**

Even if plaintiff could establish that she is "disabled" within the meaning of the Rehabilitation Act, summary judgment in favor of defendant would still be appropriate because the record evidence is insufficient as a matter of law to support plaintiff's claims of disability discrimination.  Plaintiff makes two claims in this regard:  first, that defendant failed to provide a reasonable accommodation for her disability, and second, that defendant did not select her for two overseas positions because of her disability. The Court addresses these claims in turn.

A.     **Failure to Accommodate**

In addition to proving that she has a disability within the meaning of the Rehabilitation Act, plaintiff must show that defendant had notice of her disability, that with reasonable accommodation plaintiff could perform the essential functions of her position, and that defendant refused to make such accommodations.  Scarborough, 190 F.Supp. 2d at 19.  In providing notice, the employee must supply "enough information that, under the circumstances, the employer can be fairly said to know of both the disability *and desire for an accommodation*." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999) (emphasis added).  Thus, "[i]t similarly lies with the disabled employee to request needed accommodation." Evans v. Davis Mem'l Goodwill Indus., 133 F.Supp. 2d 24, 27 (D.D.C. 2000), *aff'd*, 1 Fed. Appx. 3 (D.C. Cir. 2001) (per curiam) (citing Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999)).  The request for accommodation does not have to be formal, and the words "reasonable accommodation" do not have to be used, but the employer must be alerted to the condition and

the need for accommodation.  Evans, 133 F.Supp. 2d at 29.  The Act only protects requests

made at the time, not those suggested after the fact.  Scarborough, 190 F.Supp. 2d at 23.

Here, the primary issue is whether plaintiff's request for support in a March 2002

document constitutes a request for reasonable accommodation as to her fatigue.[15]  Plaintiff

claims that she made a "formal request" for a reasonable accommodation on a medical

questionnaire submitted to defendant on March 21, 2002, and that defendant approved this

request on March 25, 2002.  See Pl. Ex. 15 (Medical Questionnaire) at 1; Pl. Opp'n Mem. at 15.

In the medical questionnaire, plaintiff requested defendant's "support in following [her] doctor's

instructions" in the upcoming bidding cycle on foreign service assignments.  Pl. Ex. 15, at 1.

The key question and plaintiff's written response, restated here in full, do not indicate that any

further accommodation was requested:

> Please explain the specific difficulties you are having in your job;
> state the specific changes you are requesting; and, if known, state
> the medical reason you are requesting the change in your job.  Use
> a separate sheet of paper.
>
> [Plaintiff's response:] My difficulties do not relate in any way to assigned
> duties in my Work Requirements Statement.  I am not requesting a
> "change in [my] job" but am presently in a bidding cycle for another

---

[15] Plaintiff initially contended that defendant failed to grant her request for a reasonable accommodation made in October/November 2001, when she asked that defendant address the hostile work environment that allegedly led to the stress and, subsequently, plaintiff's hemorrhage.  See Am. Compl. at ¶¶ 18-20; Def. Ex. 5 (Thompson Depo.) at 34-35; Def. Ex. 8 (Pl. Resp. to Def.'s Interrogs.) at 8.  However, plaintiff has effectively abandoned this claim in her briefs, acknowledging that a request to reduce stress "may" be "unreasonable" and that defendant did, in fact, reassign her to another office to address the difficult personnel situation that was creating the stress – albeit to a position that plaintiff did not request.  See Pl. Opp'n Mem. at 14, 16.  Moreover, because a request to alleviate stress and anxiety caused by an employee's working conditions is generally unreasonable, the Court would dismiss the 2001 reasonable accommodation claim on this ground alone.  See Gaul v. Lucent Technologies, 134 F. 3d 576, 581 (3d Cir. 1998); Newby v. Whitman, 340 F.Supp. 2d 637, 657-58 (M.D.N.C. 2004).

foreign service assignment.  In the bidding process, I would like the State
Department's support in following my doctor's instructions below.

Her neurologist's portion of the questionnaire did not request a specific accommodation beyond

some discretion in managing her work and a "friendly" environment:

She should be able to continue working a 40-hour week at the
State Department in any position for which she is qualified.  I
recommend that she be given a certain amount of discretion in
managing her workload.  If possible, she should be placed in an
office, which is "employee friendly" and does not in its
circumstances represent the appearance or perception of any
directed hostility against her.

Id. at 3.

Plaintiff later stated, after this lawsuit was filed, that the accommodation she expected in

March 2002 was "reassignment to a comparable position to the one from which [she] had been

removed in IFS [Office of International Financial Services in Washington]."  Pl. Ex. 1

(Thompson Decl.) at 2, ¶ 7.  Hence, plaintiff claims that defendant failed to accommodate her by

not subsequently assigning her to one of two vacant positions in the Office of Budget and

Finance.  Plaintiff argues that she should have been transferred to one of these positions because,

unlike the detail she had been placed on, they were within her area of expertise, she was

qualified for them, and she had expressed interest in them by bidding on them previously.  In

response, defendant contends that it did not consider the March 2002 medical questionnaire to be

a request for a reasonable accommodation, but rather considered it only as a vague request for

"support," as stated on its face.  See Def. Reply Mem. at 16; Def. Suppl. Ex. 2 (Pitarelli Depo.)

at 40–41.  Furthermore, defendant argues that plaintiff's request stemmed from dissatisfaction

with her position rather than the need to accommodate a disability.  Defendant contends that

such a reassignment, which would encompass trading one full-time desk job for another, would not do anything to accommodate plaintiff's disability.

In support of her claim that she requested an accommodation, plaintiff relies on the medical questionnaire she submitted to the State Department and a letter from Barbara Pope. See Pl. Ex. 15 (Medical Questionnaire); Pl. Ex. 21 (letter from Barbara Pope to Plaintiff dated March 15, 2002). But these two documents do not provide sufficient evidence for a reasonable trier of fact to find that plaintiff asked for a reassignment specifically to address her disability. The letter from Pope reflects that plaintiff and Pope had discussed "assignment issues" on February 22, 2002, and that they had agreed that plaintiff would provide documentation to the Office of Medical Services.[16] See Pl. Ex. 21. However, nothing in the letter indicates that plaintiff requested reassignment to another position as an accommodation for her disability. In the medical questionnaire, plaintiff stated that her difficulties "*do not relate in any way to assigned duties*" and that she was not requesting a change in her job. Pl. Ex. 15 (Medical Questionnaire) at 1 (emphasis added). Rather, plaintiff asked for "support" in following her doctor's instructions during the upcoming bidding cycle for foreign service assignments. Plaintiff presents no other evidence indicating that she specifically requested a transfer to another position in Washington or any other specific accommodation for her disability. Therefore, she cannot sustain a failure to accommodate claim and defendant is entitled to summary judgment on this basis.

---

[16] The letter also indicated that because plaintiff had filed a formal grievance with the State Department, Pope's office could no longer assist her.

**B.      Failure to Select for Overseas Positions**

Plaintiff claims that defendant discriminated against her based on her disability in failing

to assign her to either the Paris or Frankfurt positions that plaintiff bid on in the 2002 bidding

cycle.  Plaintiff's disparate treatment claim is analyzed under the McDonnell-Douglas burden-

shifting framework.  See Duncan, 240 F.3d at 1114.  To establish a prima facie case of disparate

treatment under the Rehabilitation Act, plaintiff must show, in addition to having a disability,

that she was qualified to perform the essential functions of the job with or without reasonable

accommodation and that she suffered an adverse employment action because of her disability.

Furthermore, she must also show that the employer acted with awareness of the employee's

disability.  Crandall v. Paralyzed Veterans of Am., 146 F.3d 894, 897 (D.C. Cir. 1998); see also

Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 163 (5th Cir. 1996).

If the plaintiff can establish a prima facie case of discrimination, the burden then shifts to

the employer to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  The employer's burden, however, is merely

one of production.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981).  The

employer "need not persuade the court that it was actually motivated by the proffered reasons....

It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

discriminated against the plaintiff."  Id. at 254-55.

Once the defendant has proffered a legitimate non-discriminatory reason for its action,

the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for

discrimination.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  At this

point the McDonnell Douglas burden-shifting framework disappears and the sole remaining

issue is discrimination *vel non*.  To survive summary judgment, "the plaintiff must show that a

-28-

reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.  Examination of that issue requires consideration of all the relevant circumstances, including the strength of the prima facie case, any direct evidence of discrimination, and any circumstantial evidence that defendant's proffered explanation is false (which may be enough with the prima facie case to infer unlawful discrimination).  See, e.g., Reeves, 530 U.S. at 147-48; Lathram, 336 F.3d at 1089; Waterhouse v. District of Columbia, 298 F.3d 989, 993 (D.C. Cir. 2002); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc).

Here, with respect to plaintiff's prima facie case, the sole issue is whether plaintiff has established that the people responsible for selecting candidates for the two positions acted with awareness of her alleged disability -- that is, her fatigue and the limitations that it placed on her activities.  Plaintiff asserts that several selecting officials knew of this disability because she informed them of her hemorrhage and medical restrictions.  However, plaintiff has not produced evidence that she specifically informed these officials that she had a disability relating to fatigue, and defendant has submitted declarations from the selecting officials stating that they had no knowledge of that condition.  The fact that plaintiff informed selecting officials of her brain hemorrhage did not put them on notice of her fatigue-related disability.  Similarly, as discussed in Part I.D supra, the selecting officials' knowledge of her restricted medical clearance is not an indicator of a disability because it reveals nothing about whether plaintiff had an impairment that substantially limited her in a major life activity.  Therefore, based on the evidence before it, the Court concludes that a reasonable trier of fact could not find that defendant's selecting officials knew of plaintiff's fatigue-related disability during the 2002 bidding cycle.

But even assuming that plaintiff could establish a prima facie case of disability discrimination, her claim would fail as a matter of law because she has not come forward with evidence that defendant's articulated legitimate non-discriminatory reason for plaintiff's non-selection was pretextual.  For the Frankfurt position, defendant states, first, that plaintiff's bids did not appear on their list of candidates, and second, that in any event the position required a Class 1 medical clearance which plaintiff did not have.  In response, plaintiff provides a copy of the bid summary from the "eBid" system to support her contention that she did in fact bid on the position.  See Pl. Ex. 19.  Plaintiff also contends that she faxed the bids she submitted electronically to her Career Development Officer.  See Pl. Ex. 28 (email from Plaintiff to Barbara DeJournette dated 10/30/2002).  However, plaintiff's evidence is insufficient to create a genuine issue of material fact because the copy of the "eBid" summary does not indicate that plaintiff submitted the bid -- indeed, under the column for date "submitted," the entry is blank, indicating that it was not submitted.[17]  Pl. Ex. 19.

Plaintiff also claims that the Frankfurt position did not in fact require a Class 1 medical clearance because medical clearances are granted by post, not by position.  See Supp. Decl. of Jill Thompson dated 2/09/2006 at 1.  In response, defendant contends that for the Frankfurt "rover" position and other similar positions requiring extensive travel to other nations, a Class 1 clearance is normally required, and that this requirement was implemented "well prior to 2002."  Decl. of Charles Allegrone dated 1/30/2006 at ¶ 5, 7.  Although plaintiff has raised a genuine

---

[17]  The eBid summary indicates the dates on which several of plaintiff's bids were submitted, including two other Frankfurt vacancies not at issue in this litigation.  However, with respect to the Frankfurt "NOW" vacancy that is the subject of her complaint (Am. Compl. at ¶ ¶ 44-45; Pl. Opp'n Mem. at 6, 20) -- that is, line 17 of the eBid summary -- there is no submittal date listed.

issue as to whether the Frankfurt "rover" position should have been classified as requiring a Class 1 medical clearance consistent with the Department's internal regulations, the Department's adherence to those regulations is not material.   What matters is whether the Department treated the position as requiring a Class 1 medical clearance -- in accordance with regulation or not -- and plaintiff has provided no evidence rebutting defendant's assertion that a Class 1 medical clearance was considered a requirement for the Frankfurt position in the 2002 bidding cycle.   There is no evidence in the record to indicate that defendant did not honestly believe that its reason for plaintiff's non-selection was correct.   See Fischbach v. D.C. Dep't. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (as long as an employer honestly believes the reason it offers, the correctness or desirability of the result is not at issue).   Plaintiff must produce some objective evidence of pretext, but has not done so.   Mere unsubstantiated personal speculation is insufficient to create a genuine issue of material fact.   Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

With respect to the Paris position, defendant contends that another qualified individual was selected for the position.   Plaintiff responds that defendant's reason for selecting another individual for the Paris position is pretextual because plaintiff was better qualified for the position than the selectee.   Plaintiff points to a conversation she had with the selectee in 2003 as evidence supporting this argument.   See Def. Ex. 8 (Pl. Resp. to Def's Interrogs.) at 7 (Resp. 11). Plaintiff asserts that she was more qualified than the selectee based on more Foreign Service experience, more relevant experience at a Financial Services Center, and prior service at the FMP in Bangkok.   See Pl. Opp'n Mem. at 21-22.   Defendant responds that plaintiff's personal belief that she was better qualified does not create a dispute of material fact.   Furthermore,

defendant argues that plaintiff has not produced any evidence that the selecting official did not believe that the selectee was the best person for the position.

A plaintiff's subjective belief as to her qualifications is irrelevant. Waterhouse v. District of Columbia, 124 F.Supp. 2d 1, 7 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002). To establish pretext by comparing relative qualifications, plaintiff must produce "evidence from which a reasonable jury could conclude that there was a wide and inexplicable gulf between the applicants' qualifications and thus a basis to infer discrimination." Lathram, 336 F.3d at 1091; see also Ash v. Tyson Foods, Inc., 126 S. Ct. 1195, 1197-98, ___ U.S. ___ (2006) (per curiam) (recognizing that qualifications evidence "in some circumstances" may establish pretext and that several circuits have articulated this standard as supporting an inference of pretext only where a plaintiff is "clearly superior" or "significantly better qualified" than the other candidate).

Here, plaintiff has presented only her subjective personal belief that she is better qualified for the Paris position than the selectee. There is no evidence that she was in fact better qualified, much less that there was a "wide and inexplicable gulf" between plaintiff and the successful applicant, nor has plaintiff produced any other evidence that would support an inference that discrimination was the true reason for the selection. Thus, a reasonable trier of fact could not conclude that defendant's proffered reason for not selecting plaintiff was a pretext for discrimination.

### CONCLUSION

For the reasons stated above, the Court will grant defendant's motion for summary judgment. A separate order has been issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Date:  March 13, 2006

Copies to:

William T. Irelan
Friedeman, Irelan, Wward & Lamberton, P.C.
1000 Potomac Street, Northwest
The Flour Mill-Suite 400
Washington, D.C.  20007
E-mail:  wtirelan@sitestar.net

Peter Blumberg
Assistant United States Attorney
United States Attorney's Office
   for the District of Columbia
555 Fourth Street, Northwest
Washington, D.C.  20001
E-mail:  peter.blumberg2@usdoj.gov